United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-30007

S.D., by and through his next friend, Richard Dickson,

Plaintiff - Appellee,

VERSUS

DAVID HOOD, in his capacity as Secretary of the Louisiana Department of Health and Hospitals,

Defendant - Appellant.

Appeal from the United States District Court
For the Eastern District of Louisiana

Before KING, Chief Judge, DENNIS, Circuit Judge, and LYNN[*], District Judge.

DENNIS, Circuit Judge:

This appeal challenges the district court's judgment enforcing a Medicaid recipient's right of action under the Civil Rights Act, 42 U.S.C. § 1983, based on a state Medicaid agency's deprivation of his federal statutory right to medical assistance under the Medicaid Act, 42 U.S.C. § 1396 et seq. The issues are:

---

[*]District Judge for the Northern District of Texas, sitting by designation.

1

(1) whether the Louisiana Department of Health and Hospitals (LDHH), the state Medicaid agency, unlawfully denied the recipient's claim under the Medicaid Act's program for "early and periodic screening, diagnostic, and treatment services" (EPSDT) by refusing to pay for his medically prescribed disposable incontinence underwear that is necessary to ameliorate his physical and mental conditions caused by spina bifida, which results in his total bowel and bladder incontinence, loss of sensation, and continual risk of infection; and, if so, (2) whether LDHH's violation of the statute deprived the recipient of a right secured by federal statute for which he may bring an action for redress under 42 U.S.C. § 1983.

I.

A.

The plaintiff, S.D., a sixteen-year-old Medicaid recipient, is afflicted with spina bifida, a congenital defect characterized by imperfect closure of the spinal column. Because of his birth defect, S.D. has total bowel and bladder incontinence and does not have sensation below his waist. Thus, he cannot sense potentially infectious skin irritations resulting from incontinence. S.D. also has two club feet and has trouble walking. He requires leg braces, forearm crutches, and a swing gate to move over short distances. He requires a wheelchair to move over long distances.

As an infant, S.D. was placed in foster care. He was adopted by his parents, and he receives Medicaid benefits pursuant to a

2

federal policy to encourage the adoption of special needs children. He is a qualified recipient of Medicaid's EPSDT program, under which states provide, in accordance with federal law, screening, diagnosis and treatment services to individuals under age twenty-one. Before S.D. moved to Louisiana with his family, he was provided with disposable incontinence underwear by the Virginia Medicaid program.

In 2002, S.D.'s Louisiana physician, Dr. Ernest Edward Martin, Jr., Chairman of the Department of Family Medicine of the Ochsner Clinic, prescribed disposable incontinence underwear as health care that is necessary to ameliorate S.D.'s mental and physical conditions. Specifically, Dr. Martin concluded that the prescription of such underwear "was physically necessary because it draws moisture away from the skin which prevents chronic irritation and infection from urine wetness." R. 191. According to Dr. Martin, "[t]his protection is especially important due to S.D.'s lack of sensation below the waist. Because of this lack of sensation, S.D. would not be aware if he developed an infection and an infection could then progress quickly." *Id.* Finally, Dr. Martin determined that without such a prescription, S.D. would be home bound, isolated, and unable to attend school or engage in other age-appropriate activities. Thus, the prescription was necessary from a mental health standpoint as well. S.D. submitted a claim for medical assistance for the cost of the prescription to LDHH under the Louisiana State Medicaid Plan.

LDHH denied S.D.'s claim stating that "the appliance, equipment, supplies or service is available through another agency,"[1] "the item is not considered medically necessary" and that it was a "non-medical supply not covered by Medicaid." S.D. appealed administratively. The state administrative law judge ruled in favor of LDHH without referring to the Medicaid EPSDT provisions. Rather, the administrative law judge concluded that LDHH properly denied coverage because "diapers" are "specifically excluded from coverage" under the Louisiana State Medicaid Plan.

S.D. brought this action in the district court against LDHH under 42 U.S.C. § 1983 seeking injunctive and declaratory relief. On cross motions for summary judgment, the district court granted S.D.'s motion and denied that of LDHH. The district court concluded that under the Medicaid Act's EPSDT program a qualified recipient is entitled to the health care, services, treatment and other measures described in § 1396d(a) of the Act when such care or services are necessary for corrective or ameliorative purposes; the EPSDT provisions of the Medicaid Act create rights enforceable by § 1983; and LDHH deprived S.D. of his federal right to EPSDT benefits in violation of the Medicaid Act. Accordingly, the district court rendered summary judgment declaring that S.D. is entitled to medical assistance for the prescribed disposable incontinence underwear under the EPSDT program and ordering LDHH to

---

[1] On appeal, LDHH concedes that this reason for denial appears to have been in error. LDHH First Br. p. 2.

4

provide medical assistance to S.D. for that purpose. LDHH appealed.

We review the district court's decision de novo, both because it is a summary judgment, and because it requires us to answer issues of statutory interpretation. *See Hodges v. Delta Airlines*, Inc., 44 F.3d 334, 335 (5th Cir. 1995) (en banc); *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999). Summary judgment is appropriate only when the record indicates "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Because there is no dispute as to any material issue of fact in this appeal, our review is limited to whether the plaintiff is entitled to judgment as a matter of law.

## B.

Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396 et seq.; *see also Atkins v. Rivera* 477 U.S. 154, 156 (1986); *Louisiana v. United States Dep't. of Health and Human Servs.*, 905 F.2d 877, 878 (5th Cir. 1990). States electing to participate in the program must comply with certain requirements imposed by the Act and regulations of the Secretary of Health and Human Resources. *See Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 915 (5th Cir. 2000) ("The [Medicaid] program is voluntary; however, once a state chooses to join, it must follow the requirements set forth in the Medicaid Act and in its

5

implementing regulations.") The Secretary has delegated his federal administrative authority to the Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services. *See Louisiana v. United States Dep't of Health and Human Servs.*, 905 F.2d at 878.[2]

To qualify for federal assistance, a state must submit to the Secretary and have approved a "state plan" for "medical assistance," 42 U.S.C. § 1396a(a), that contains a comprehensive statement describing the nature and scope of the state's Medicaid program. 42 CFR § 430.10 (1989). "The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical assistance provided to eligible individuals." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

The Medicaid Act defines "medical assistance" as "payment of part or all of the cost of...care and services" included in an enumerated list of twenty-seven general health care categories ("medical assistance categories"). 42 U.S.C. § 1396d(a). Some of the categories must be included within state plans (mandatory categories) while others may be included at the option of the state

---

[2] Prior to July, 2001, CMS was known as the Health Care and Financing Administration ("HCFA"). *See* Department of Health and Human Services Reorganization Order*,* 66 Fed. Reg. 35437 (July 5, 2001). For consistency, this opinion will refer to the agency as CMS, even when referring to the period when it was still designated as HCFA.

(optional categories).  42 U.S.C. § 1396a(a)(10)(A).

The Act requires that each state plan provide EPSDT health care and services as a mandatory category of medical assistance. The Act describes EPSDT as "early and periodic screening, diagnostic, and treatment services (as defined in subsection (r) of this section) for individuals who are eligible under the plan and are under the age of twenty-one;". 42 U.S.C. §§ 1396a(a)10(A), 1396d(4)(B). Subsection (r) further defines EPSDT services as, inter alia, "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan."  42 U.S.C. § 1396d(r)(5).

Thus, EPSDT is a comprehensive child health program designed to assure the availability and accessibility of health care resources for the treatment, correction and amelioration of the unhealthful conditions of individual Medicaid recipients under the age of twenty-one.  *See* CMS State Medicaid Manual § 5010.B [hereinafter "SMM"]. A principal goal of the program is to "[a]ssure that health problems found are diagnosed and treated early, before they become more complex and their treatment more costly." *Id.*

Louisiana's State Medicaid Plan was approved by CMS.  As part

of its state plan, Louisiana proposed and CMS approved the provision of the optional medical assistance category of "home health care services" to Louisiana's general adult Medicaid population. *See* 42 U.S.C. § 1396d(a)(7). Additionally, Louisiana proposed and CMS approved a "payment program" which excludes certain medical supplies from the "home health care services" made available to <u>general adult Medicaid population</u>.[3] The parties agree that the "payment program" exclusion implicitly disallows payment for disposable incontinence underwear for adult recipients over the age of twenty-one. The Louisiana state plan approved by CMS does not, however, explicitly or implicitly, exclude the prescription of incontinence supplies from the EPSDT benefits which must be provided to <u>EPSDT children,</u> i.e., recipients under the age of twenty-one qualified for the EPSDT program.[4]

In its appeal, LDHH does not challenge the district court's determinations that (1) S.D. is eligible for coverage by the EPSDT program, (2) S.D. has physical and mental illnesses and conditions

_____

[3] In a section of the state plan describing reimbursement rates and methods for the home health care services provided under the plan, the plan states that all covered medical supplies will be reimbursed through the durable medical equipment program. The state plan further provides that "[d]iapers and blue pads are not reimbursable as durable medical equipment items."

[4] The exclusion, described in the preceding footnote, does not mention the EPSDT program. Payments provided under the EPSDT program, and the scope of services provided under that program, are described in other sections of the state Medicaid plan. Those sections do not contain an exclusion for incontinence supplies.

caused by permanent bowel and bladder incontinence resulting from an irreparable birth defect of spina bifida, and that, (3) the medical prescription of disposable incontinence underwear is a health care, service, treatment, or measure necessary to correct or ameliorate S.D.'s unhealthful physical and mental conditions discovered by the screening services. Thus, there is no factual or legal dispute as to the conclusions that S.D. is eligible to receive EPSDT services and that the medical assistance for the prescription of disposable incontinence underwear he seeks is necessary to ameliorate his unhealthful conditions discovered by screening within the terms of the EPSDT program.

LDHH contends, however, that, despite the necessity of the prescription of incontinence underwear to the amelioration of S.D.'s condition, the denial of S.D.'s claim should be reinstated because: (1) The district court overstated the scope of the EPSDT mandate by adopting the "convenient shorthand" or "erroneous assumption" that a state is required to provide EPSDT children with any service that could be provided for in a state plan, even if the service is not one that the state has elected to provide; (2) The medical prescription of disposable incontinence underwear, although necessary to ameliorate S.D.'s condition for ESPDT purposes, does not constitute a health care, service, treatment or measure "described in Section 1396d(a)" of the Act; (3) Louisiana's State Medicaid Plan, as approved by CMS, excludes incontinence supplies

from coverage under the EPSDT program; (4) LDHH had the implied authority or discretion to exclude this type of health care or service without the approval of CMS; and (5) Section 1983 of Title 42, which affords a cause of action for the "deprivation of any rights . . . secured by [federal] laws," does not provide S.D. with a right of action to sue LDHH because the provisions of the Medicaid Act upon which S.D. relies does not create an enforceable "right" within § 1983's meaning.

## II.

LDHH sets the stage for all of its arguments by contending that the district court's decision was based on the "erroneous assumption" or "convenient shorthand" that the EPSDT mandate requires a state to provide eligible children with any health care, service, treatment or other measure that could be provided for in its state plan, even if the health care or service is not one that the state has elected to provide. LDHH conveniently omits a crucial part of the district court's holding, however, because that court said, as does the statute, that states participating in Medicaid are required to provide medical assistance under the EPSDT program only for health care, services, treatments and other measures (1) described in § 1396d(a), that are (2) necessary to correct or ameliorate defects and physical or mental illnesses and

10

conditions discovered by the screening services.[5]  Moreover, LDHH

has failed to demonstrate how the statute appropriately may be

construed more narrowly in view of its plain words, legislative

history, authoritative interpretation by CMS, and the consonant

decisions of four other federal Circuits.  Nevertheless, in order

to avoid confusion and provide a firm foundation for addressing the

issues, we will set forth our understanding of the nature and scope

of the EPSDT mandate.

In determining the meaning of the Medicaid Act's EPSDT

provisions, the starting point is the language of the statute

itself. *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241

(1989)( citing *Landreth Timber Co. V. Landreth*, 471 U.S. 681, 685

(1985)).  Section 1396a(a)(10) provides that a state plan for

medical assistance must make available to all qualified individuals

"the care and services listed in" § 1396d(a)(4).  Section

1396d(a)(4)(B) provides that "medical assistance" means payment of

---

[5] LDHH's First Br. P.11-12. LDHH further mischaracterizes
the district court's decision as holding "that a State must
provide children with any and all services for which it could
receive FFP [, i.e., federal financial participation]."  LDHH
First Brief p. 12. LDHH then proceeds to list a variety of
Medicaid services, not described in 42 U.S.C. § 1396d(a), for
which FFP is available. The district court decision does not
address non-§ 1396d(a) FFP, however, but quite correctly decides
the issue raised by this case, viz., whether the prescription of
disposable incontinence underwear necessary for EPSDT corrective
or ameliorative purposes is "described in" 42 U.S.C. § 1396d(a).
*See* Order and Reasons of  district court at 9, 16 (E.D. La #02-
CV-2164) (December 5, 2002).  The subject of "FFP" for services
outside the scope of § 1396d(a) is simply irrelevant and LDHH's
argument regarding it is nothing more than a distraction.

part or all of the "cost of the following care and services" for individuals: "early and periodic screening, diagnostic, and treatment [EPSDT] services (as defined in subsection (r) of this section) for individuals who are eligible under the plan and are under the age of twenty-one[.]" Section 1396d(r), in pertinent part, provides that "[t]he term 'early and periodic screening, diagnostic, and treatment services' means the following items and services: ....(5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

The crucial phrases of § 1396d(r)(5) provide that EPSDT care and services include: (1) "health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)]" (2)"necessary... to correct or ameliorate...conditions discovered by the screening services" (3) "whether or not such services are covered under the State plan." The natural reading of § 1396d(r)(5)'s phrases is that all of the health care, services, treatments and other measures described by § 1396d(a) must be provided by state Medicaid agencies when necessary to correct or ameliorate unhealthful conditions discovered by screening, regardless of whether they are covered by the state plan. This

reading is also required by the grammatical structure of § 1396d(r)(5). The medical assistance made available to EPSDT children must be for health care described in the list of twenty-seven categories set forth in § 1396d(a)-modified by the requirement that it must be necessary for corrective or ameliorative EPSDT purposes-further modified by the statutory mandate that it must be provided whether or not it is covered under the state plan. The language and structure Congress used cannot be read in any other way without rendering the crucial phrases meaningless.

The plain meaning of statutes is conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc*., 458 U.S. 564, 571 (1982). This is not one of those rare cases because the Act, as literally applied, is fully consistent with the intent of its drafters.

The EPSDT program was added to the Medicaid Act in 1967. Under the original EPSDT provision, all Medicaid-eligible individuals under age twenty-one were entitled to "such early and periodic screening and diagnosis...to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary."

13

(emphasis added) Pub.L.90-248, 81 Stat. 929, codified at § 1396d(a)(4)(U.S. Code 1988 edition). Congress thus initially authorized the Secretary to make regulations providing for treatment and health care measures to correct or ameliorate defects and chronic conditions. The Secretary promulgated regulations which provided for care and treatment that he designated as "discretionary services" and provided that a state plan "may provide for any other medical or remedial care" defined as medical assistance by the Act. *See* 42 CFR § 441.57.

By 1989 Congress had become concerned that, because the original EPSDT health care, services and treatment provision was optional and not described in detail in the statute, many states had chosen not to provide EPSDT-eligible children all the care and services allowable under federal law. *See* Senate Finance Committee Report, 135 Cong. Rec. 24444 (Oct. 12, 1989) ("The EPSDT benefit package has never been described in detail in the statute. . . . Additionally, while states have always had the option to do so, many still do not provide to children participating in EPSDT all care and services allowable under federal law, even if not otherwise included in the state's plan.") Congress therefore amended the Act in 1989 to mandate that a state agency must provide EPSDT-eligible children "[s]uch other necessary health care...described in [the Act's § 1936d(a) definition of "medical assistance"] to correct or ameliorate defects . . . illnesses and

14

conditions discovered by the screening services, <u>whether or not such services are covered under the State plan.</u>" 42 U.S.C. § 1396d(r)(5) (emphasis added). Consequently, Congress in the 1989 amendment imposed a mandatory duty upon participating states to provide EPSDT-eligible children with all the health care, services, treatments and other measures described in § 1396d(a) of the Act, when necessary to correct or ameliorate health problems discovered by screening, regardless of whether the applicable state plan covers such services.

Furthermore, the Senate Finance Committee noted that the 1989 amendments "require that states provide to children <u>all treatment items and services that are allowed under federal law</u> and that are determined to be necessary . . . even if such services are not otherwise included in the State's plan." 135 Cong. Rec. S13234 (Oct. 12, 1989) (emphasis added); *See also* 135 Cong. Rec. S6900 (June 19, 1989)(statement of Sen. Chafee) (Under amendment "Medicaid would cover any medically necessary service identified as necessary through the EPSDT program"); H.R. Conf. Rep. 101-386, at 453 (1989) (amendment would require States "to provide any service that a State is allowed to cover with Federal matching funds under Medicaid that is required to treat a condition identified during a screen, whether or not the service is included in the State's Medicaid plan.") Thus, the text of the statute and its legislative history demonstrate that states participating in the Medicaid

15

program must provide all of the health care and services permitted under § 1396d(a) when necessary to correct or ameliorate a defect or condition discovered by screening.

Accordingly, every Circuit which has examined the scope of the EPSDT program has recognized that states must cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a). *See Collins v. Hamilton*, 349 F.3d 371, 376, n.8 (7th Cir. 2003) ("a state's discretion to exclude services deemed 'medically necessary' . . . has been circumscribed by the express mandate of the statute"); *Pittman by Pope v. Sec'y, Fla. Dep't of Health & Rehab.*, 998 F.2d 887, 892 (11th Cir. 1993)(1989 amendment adding § 1396d(r)(5) took away any discretion state might have had to exclude organ transplants from the treatment available to individuals under twenty-one); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Services,* 293 F.3d 472, 480-81 (8th Cir. 2002) (state must provide EPSDT coverage for "early intervention day treatment" as part of § 1396(a)(13)'s "rehabilitative services" category because program was structured to ameliorate conditions and strengthen skills children learn in therapy); *Pereira v. Kozlowski*, 996 F.2d 723, 725-26 (4th Cir. 1993) ("[i]n section 1396d(r)(5), the Congress imposed upon the states, as a condition of their participation in the Medicaid program, the obligation to provide to children under the age of twenty-one all necessary

16

services, including transplants.")

CMS, the federal agency charged with the responsibility of administering the Medicaid Act, also recognizes that under the EPSDT mandate states are required to provide any service which can be provided under § 1396d(a) if such service is necessary to correct or ameliorate a defect, illness or condition identified by screening. In the State Medicaid Manual, the "official medium by which [CMS] issues mandatory, advisory, and optional Medicaid policies and procedures to the Medicaid State agencies,"[6] CMS explains:

> OBRA 89 amended §§ 1902(a)(43) and 1905(a)(4)(B) and created §1905(r) of the Social Security Act (the Act) which set forth the basic requirements of the program. <u>Under the EPSDT benefit....the Act requires that any service which you are permitted to cover under Medicaid that is necessary to treat or ameliorate a defect, physical and mental illness, or a condition identified by</u>

---

[6] SMM, Foreword.  Although not entitled to *Chevron* deference, relatively informal CMS interpretations of the Medicaid Act, such as the State Medicaid Manual, are entitled to respectful consideration in light of the agency's significant expertise, the technical complexity of the Medicaid program, and the exceptionally broad authority conferred upon the Secretary under the Act.  *Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 (2002) (citing  *United States v. Mead Corp.*, 533 U.S. 218 (2001); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Schweiker v. Gray Panthers*, 453 U.S. 34, 43-44 (1981)).

17

> a screen, must be provided to EPSDT participants
> regardless of whether the service or item is otherwise
> included in your Medicaid plan.

CMS State Medicaid Manual ("SMM") § 5110 (1990)(emphasis added). Thus, according to CMS "[t]he law requires the provision of the services needed by EPSDT clients if the services can be covered under the Medicaid program." *Id.*, § 5340 (emphasis added).

Accordingly, CMS interprets the Act to allow a state Medicaid agency to fix or adjust the amount, duration and scope of services provided under the EPSDT benefit only if that regulation "comports with the requirements of the statute that all services included in [§ 1396d(a)] of the Act that are medically necessary to ameliorate or correct defects and physical or mental illnesses and conditions discovered by the screening services are provided."[7] SMM § 5122. Moreover, the agency construes the statute to require that any limitation imposed must permit and afford services "sufficient to achieve their [EPSDT] purpose (within the context of serving the

---

[7] SMM § 5122, in pertinent part, provides: "42 CFR 440.230 allows you to establish the amount, duration and scope of services provided under the EPSDT benefit. Any limitations imposed must be reasonable and services must be sufficient to meet their purpose (within the context of serving the needs of individuals under twenty-one). You may define the service as long as the definition comports with the requirements of the statute in that all services included in [§ 1396d(a)] that are medically necessary to ameliorate or correct defects and physical or mental illnesses and conditions discovered by the screening services are provided."

18

needs of individuals under the age of twenty-one)." *Id.* Consequently, under the CMS interpretation, a state Medicaid agency may regulate the amount, duration and scope of medical assistance provided, but its regulation must comply with the statutory requirement that all health care and services described in § 1396d(a) that are necessary to the corrective and ameliorative purposes of the EPSDT program must be provided.

On the contrary, appellate counsel for LDHH contend that the twenty-seven health care and service categories enumerated in § 1396d(a) are only hollow forms that each state may fill with as few or as many types of health care, treatment, services and measures as it deems appropriate. Their rationale is that: (1) Section 1396d(a) "is a definitional statute describing the components of 'medical assistance.'" (2) "By citing to these definitions, the EPSDT benefit incorporates them as and to the extent they have been described by Congress in the statute." (3) "Therefore, EPSDT entitles Medicaid recipients to what is provided for in section [1396d(a)], but does not dictate the precise content of each...category of service." (4) Thus, "[t]he EPSDT benefit described in Section [1396d(r)], while broad, does not undermine the State's authority and discretion to establish reasonable standards . . . for determining eligibility for and the extent of

19

medical assistance under the plan."[8]

The interpretation proffered by LDHH counsel conflicts sharply with the Congressional intent of the 1989 EPSDT amendment as expressed simply and clearly by its plain words, legislative history, CMS interpretations, and as recognized by the federal Circuits by which it has been considered. According to its words, a principal goal of the 1989 amendment is to correct or ameliorate the defects, illnesses and conditions of EPSDT children discovered by the screening services. The means to be used for this purpose are also clear: health care, diagnostic services, treatment, and other measures described in § 1396d(a). Equally plain is the criterion for the application of these means: the health care requested must be necessary to "correct or ameliorate" an eligible EPSDT child's defect, illness or condition. 42 U.S.C. § 1396d(r)(5). Furthermore, the legislative history demonstrates Congress intended the health care and treatment available under the EPSDT program to be made more accessible and effective by: removing the Secretary's express authority to define the means and the standards for its operation; placing the goal, means and standards in the statute itself; and by imposing an obligatory,

_____

[8] LDHH first brief p.21. Most of LDHH's brief ostensibly directed to statutory construction actually presents its appellate counsel's post hoc rationalizations of a discretionary basis for the agency's action. For the reasons stated in part IV. of this opinion, we conclude that those reasons cannot provide justification for LDHH's denial of S.D.'s statutory right.

not discretionary, duty on states to effectuate this aspect of the EPSDT program "whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

Thus the plain words of the statute and the legislative history make evident that Congress intended that the health care, services, treatment and other measures that must be provided under the EPSDT program be determined by reference to federal law, not state preferences. The 1989 amendment was clearly a response to the disappointing performance of the EPSDT treatment function as optional and within each state's discretion. We reject the notion of LDHH's counsel that Congress made the provision of such treatment mandatory on the states only to cede to the states complete discretion to decide upon the contents of the twenty-seven medical assistance categories purportedly made available to EPSDT eligible children.

All of this is confirmed by the interpretations of CMS. CMS regulations interpret and implement § 1396d(a) in highly detailed specific definitions of the supposedly hollow health care categories. *See* 42 CFR §§440.1—440.185 (2003). CMS does not interpret the enumerated health care categories as empty vessels to be filled according to the states' discretion. Instead, CMS construes the twenty-seven categories to have definite substantive content.

Furthermore, CMS interprets the Act to require that any

21

service a state is permitted to cover under Medicaid that is necessary to treat or ameliorate a defect, physical and mental illness, or condition identified by a screen, must be provided to EPSDT participants regardless of whether the service or item is otherwise included in the state Medicaid plan. SMM § 5110. Thus, LDHH counsel's argument that, for purposes of the EPSDT program, states are merely required to recognize the twenty-seven medical assistance categories and fill them with as few or as many types of health care and services as the states, within their discretion, see fit is completely inconsistent with CMS's interpretation of the EPSDT statutory provisions.

As already related, the federal Circuits that have analyzed the 1989 ESPDT amendment agree that Congress did not grant or allow states the discretion to define what types of health care and services would be provided to ESPDT children, and that participating states must provide all services within the scope of § 1396d(a) which are necessary to correct or ameliorate defects, illnesses, and conditions in children discovered by the screening services. *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003) (state must provide long term residential treatment to EPSDT recipients under the "inpatient psychiatric hospital services" category; state cannot choose to limit category to acute services); *Pittman by Pope v. Sec'y, Fla. Dep't of Health & Rehab.*, 998 F.2d 887, 892 (11th Cir. 1993)(state cannot exclude

22

organ transplants, which are not specifically listed in § 1396d(a), from the health care, services, treatment and other measures available under the EPSDT program); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Services,* 293 F.3d 472, 480-81 (8th Cir. 2002) (state must provide EPSDT medical assistance for "early intervention day treatment" as part of § 1396(a)(13)'s "other diagnostic, screening, preventive, and rehabilitative services" category).

As inspiration for its EPSDT "hollow categories" theory, LDHH draws only upon the anomalous opinion in *Salgado v. Kirschner*, 878 P.2d 659, 663 (Ariz. 1994), which devised the theory in dictum in a non-EPSDT case. Aside from its conflict with all federal authority, the *Salgado* court demonstrated a fundamental misunderstanding of the EPSDT benefit when it stated that "the special treatment § 1396d(r) accords to persons under twenty-one are for services directly related to their status as young persons: basically well-baby and adolescent care." *Id*. at 665. Although the EPSDT program includes youth-related services, nothing in the statute, its legislative history or CMS interpretations supports such a restrictive construction of the EPSDT benefit. In fact, many of the services provided under the EPSDT program are quite obviously not related to the recipient's status as a young person. For example, family planning services, pre-natal care, and smoking-cessation drug therapy are all

provided under the EPSDT program and yet are not applicable only to youthful recipients. *See* SMM § 5124(3); CMS Letter to State Medicaid Directors, Jan. 5, 2001.[9] Accordingly, we are not persuaded by the reasoning of the *Salgado* Court. *See also* Leanne E. Dodds-Eastman, Note, Salgado v. Kirschner: *May Arizona Deny Life-sustaining Organ Transplant Coverage to Adult Medicaid Recipients under the Federal Medicaid Statute?*, 27 Ariz. St. L.J. 251, 263 (1995)(concluding that the *Salgado* court misinterpreted the EPSDT statutory mandate.)

For these reasons, we conclude that a state Medicaid agency must provide, under the EPSDT program, (1) any medical assistance that a state is permitted to cover under § 1396d(a) of the Medicaid Act, that is (2) necessary to correct or ameliorate defects and physical and mental illnesses and conditions discovered by screening.

III.

Because LDHH does not challenge the district court's determination that, for purposes of the EPSDT benefit, the medical prescription of disposable incontinence underwear is necessary to ameliorate conditions caused by S.D.'s spina bifida and total bowel and bladder incontinence, we next address whether this type

---

[9] available at http://www.cms.hhs.gov/states/letters/smd01051.asp.

of medical assistance is "described in" § 1396d(a). As LDHH acknowledges, this question is "the heart of this case[.]" LDHH Reply Br., p. 8.

The Medicaid Act does not directly address the question of whether medically prescribed incontinence supplies are included within the "home health care services" category of medical assistance, as argued by the plaintiffs and apparently determined by the district court. Therefore, we follow the decision of the Supreme Court in *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) by looking first to the regulations of CMS that interpret the statute. In *Chevron*, the Court held that:

"When a court reviews an agency's construction of the statute which it administers[, and determines] that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction." *Id.*, 843 (footnotes omitted); *See Texas v. United States Dep't Health & Human Serv.*, 61 F.3d 438, 440 (5th Cir. 1995)(following *Chevron* in evaluating the agency's interpretation of the Medicaid statute).

"The power of an administrative agency to administer a congressionally created...program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, supra, 467 U.S. at 843 (quoting from *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). The Supreme Court has long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *Id.*, 844 (citing eleven of its decisions from *Edwards' Lessee v. Darby*, 12 Wheat. 206, 210, 6 L.Ed. 603 (1827) to *Blum v. Bacon*, 457 U.S. 132, 141 (1982)); *accord White v. United States*, 143 F.3d 232, 237 (5th Cir. 1998); *Sykes v. Columbus & Greenville Railway*, 117 F.3d 287, 295 (5th Cir. 1997).

CMS has promulgated a regulation, codified as 42 CFR § 440.70, which provides, in pertinent parts, that "[h]ome health services include...[m]edical supplies, equipment, and appliances suitable for use in the home...[when provided to a recipient at] his place of residence...." Further, 42 CFR § 441.15, in relevant part, provides: "With respect to the services defined in § 440.70...a State plan must provide that—(a) Home health services include, as a minimum....(3) Medical supplies, equipment, and appliances." In light of the well settled principles reaffirmed by *Chevron*, we conclude that the agency's interpretation of "home health care services" as including "medical supplies," when used

26

under the circumstances specified in its regulation, is clearly a permissible statutory construction.[10]

We have consistently held that a regulation should be construed to give effect to the natural and plain meaning of its words. *Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 787 (5th Cir. 2000); *United States v. Raymer*, 876 F.2d 383, 389 (5th Cir. 1989); *Alabama Air Pollution Comm'n v. Republic Steel Corp.*, 646 F.2d 210, 213 (5th Cir. 1981); *Diamond Roofing, Inc. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). Giving effect to the natural and plain meaning of the term "medical supplies" in the context of this case, we find that such medical supplies reasonably include the incontinence supplies medically prescribed for S.D.[11]

---

[10] LDHH initially argues that "disposable incontinence supplies" may not be paid for as part of medical assistance defined by § 1396d(a) because they are not listed verbatim in that section; and that the only "supplies" listed in the section are in § 1396d(a)(12): prescribed drugs, dentures, prosthetic devices, and eye glasses. LDHH First Brief 13. Two pages later, however, LDHH acknowledges that the CMS regulation implementing the Act provides that "home health care services" includes "medical supplies...suitable for use in the home," although they are not listed in the statute. *Id.*, 15

[11] "Home health care services" is not strictly limited to items or services that are used exclusively within the interior of the recipient's home. The applicable regulation notes only that home health care services cannot be provided at "a hospital, nursing facility, or intermediate care facility for the mentally retarded." 42 C.F.R. § 440.70(c). No other restrictions are placed on the location at which they are provided or used. In addition, at least one other circuit has noted that limiting the provision of home health services to services provided inside the

More importantly, CMS has approved state Medicaid plans that expressly provide incontinence supplies under the home health care category of medical assistance.[12]  This demonstrates that CMS

---

home "ignores the consensus among health care professionals that community access is not only possible but desirable for disabled individuals." *Skubel by Skubel v. Fuoroli*, 113 F.3d 330, 336 (2d Cir. 1997).  Thus, in *Skubel*, the court determined that nursing services provided under the home health care medical assistance category cannot be limited to services provided inside the recipient's home. *Id.*

[12] Because the term "medical supplies" reasonably includes medically prescribed incontinence supplies, state plans need not enumerate such items in order to provide them under the home health care category of medical assistance.  Six states, however, expressly mention the items in their approved state plans either to note restrictions placed upon the benefit or as part of an enumerated list of items available under a specific payment program. Specifically, Montana's plan notes that it provides diapers, limiting recipients to the nearest package size over 180 diapers per month; Idaho provides incontinence supplies, noting that "[i]ncontinent supplies will only be purchased for persons over the age of four years of age.  Disposable diapers are restricted in number to 240 per month.  Disposable underpads are restricted to 150 per month[;] any request for incontinent supplies above these amounts must have prior approval by the Department."  Michigan provides diapers and selected incontinence supplies under its home health care services program as long as the supplies are obtained from the state's contractor; Virginia provides incontinence supplies, noting only that "[p]reauthorization is required for incontinence supplies provided in quantities greater than two cases per month." Arkansas provides a more detailed explanation, noting that "[d]iapers/underpads are limited to $130.00 per month, per recipient.  The $130.00 benefit limit is a combined benefit limit for diapers/underpads provided through the Prosthetics Program and Home Health Program.  The benefit limit may be extended with proper documentation.  Only patients with a medical diagnosis other than infancy which results in incontinence of the bladder and/or bowel may receive diapers.  This coverage does not apply to infants who would otherwise be in diapers regardless of their medical condition.  Providers cannot bill for underpads/diapers if a recipient is under the age of three years."  Missouri's plan states that EPSDT eligible recipients are eligible for certain

28

interprets the § 1396d(a)(7) "home health care services" category as appropriately covering incontinence supplies under its construction of the statute. *See* 42 CFR § 440.70. As the agency entrusted with the administration of the Medicaid statute, CMS is required to determine that each state plan is in conformity with the specific requirements of the Medicaid act. *See* §1396a(b); 42 CFR 430.10; 430.15; *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002)(CMS "reviews each plan to assure that it complies with a long list of federal statutory and regulatory requirements"); *Rite Aid of Penn. v. Houstoun*, 171 F.3d 842, 847 (3d Cir. 1999)("federal statutes and regulations establish the criteria for [CMS] to make its decision" to approve or disapprove a state plan). The agency's review and determination definitively indicate whether it interprets a state plan or amendment to be in conformity with the statute. For example, CMS on many occasions has disapproved proposed state plans or programs because they were outside the scope of the Act. *Texas v. United States Dep't of Health and Human Servs.,* 61 F.3d 438, 441-42 (5th Cir. 1995)(upholding rejection of Texas state plan amendment because it provided chemical dependency services outside scope of Medicaid Act); *Okla. v. Shalala,* 42 F.3d 595, 598 (10th Cir.

---

durable medical equipment, including diapers. Maryland includes "incontinency pants and disposable underpads" as part of its durable medical equipment program. Wisconsin notes that it provides "disposable diapers" as a disposable medical supply.

29

1994)(discussing the disapproval of Oklahoma's plan); *New Mexico Dep't of Human Servs. v. Dep't of Health & Human Servs.*, 4 F.3d 882, 884 (10th Cir. 1993) (reviewing disapproval of amendment to New Mexico State Medicaid Plan); *New York v. Sullivan,* 894 F.2d 20, 24 (2d Cir. 1990) (discussing the disapproval of New York's plan); *Ohio Dep't of Human Servs. v. United States Dep't of Health & Human Servs.*, 862 F.2d 1228, 1229 (6th Cir. 1988)(reviewing the disapproval of Ohio's plan).

CMS's approval of state plans affording coverage for the provision of incontinence supplies as a proper cost of home health care services demonstrates that the agency construes § 1396d(a)(7) as encompassing that type of medical care or service.[13] *See Pharm. Research and Mfrs. Am. v. Thompmson*, 362 F. 3d 817, 821-22 (D.C. Cir. 2004) (CMS interpretation of relevant statutory provisions, as embodied in its approval of state Medicaid plans, is entitled to *Chevron* deference); *Texas v. United States Dep't of Health &*

---

[13] LDHH contends that determining what is "described in" a medical assistance category by reviewing the services that CMS has approved as falling within that category permits other states to dictate the scope of services that must be provided under Louisiana's EPSDT program. LDHH Reply Br. 10. This argument lacks merit. Each state plan must be approved by CMS and CMS reviews state plans to ensure conformity with the Medicaid Act. CMS's approval of a state plan is therefore an implicit interpretation of the Act. Thus, the Act itself, as interpreted by CMS (subject to judicial review), dictates the scope of services that must be provided under the EPSDT program, not mere proposals of plans or plan amendments by the states. *See Pharm. Research and Mfrs. America v. Thompmson*, 362 F. 3d 817, 821-22 (D.C. Cir. 2004).

*Human Servs*, 61 F.3d at 440 (according *Chevron* deference to CMS denial of state plan amendment); *Indiana Ass'n Homes for Aging Inc. v. Ind. Office of Med. Policy & Planning*, 60 F.3d 262, 266 (7th Cir. 1995)(reviewing approved state plan amendment with deference); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir. 1991)(same). Accordingly, we conclude that incontinence supplies are described in the medical assistance category of "home health care services" and, therefore, must be provided to EPSDT eligible children if necessary to correct or ameliorate a condition discovered by screening.

Contrary to LDHH's contention CMS approval of Louisiana's effective exclusion of incontinence supplies from the home health care services covered for the <u>general Medicaid population</u>, further corroborates our conclusion that under CMS's interpretation of the Act, the prescription of incontinence supplies is a form of medical assistance that is "described in" the home health care services medical assistance category. §1396d(a)(7). The natural and ordinary meaning of "exclusion" in this context is to expel or bar from a place or position previously occupied.[14] Thus, the submission and approval of the special provisions that effectuate that exclusion strongly indicates that both Louisiana and CMS construed the category of "home health care services" to include

---

[14] *See* Miriam Webster's Collegiate Dictionary (10th Ed. 1998) p. 404.

31

incontinence supplies in the absence of the exclusion. The provision effectuating the exclusion was necessary to expel or bar incontinence supplies from the place or position they otherwise occupy as part of the medical supplies covered under the home health care services medical assistance category. Otherwise, the provision would have been unnecessary and illogical.

Further, the § 1396d(a)(7) category of home health care services is an optional, not a mandatory, category of medical assistance. §1396a(a)(10)(A). Thus, the state was not required to provide this category of care and services to individuals over the age of twenty-one at all. Consequently, the fact that CMS approved a state plan, adopting the optional category of home health care services, subject to an effective incontinence supplies exclusion, does not indicate that the agency construed § 1396d(a)(7) itself to exclude incontinence supplies. Instead, it suggests that both Louisiana and CMS knew that, if the state adopted that category and did not adopt a provision effectively excluding incontinence supplies, it would be forced to afford incontinence supply service to eligible individuals over twenty-one years old; that the state wished to avoid the cost of this service for the older class of recipients; and that the CMS approved the provision effectively excluding the service because the state was not obligated by the statute to undertake any aspect of the optional category of coverage in the first place. At most,

32

CMS's approval of the effective exclusion indicates only that the exclusion may be an appropriate limitation on the scope of the home health care benefit *as it applies to recipients over twenty-one years of age*. It does not express or imply that CMS has approved an exclusion applicable to EPSDT benefits.

In sum, the prescription of disposable incontinence underwear that is necessary to ameliorate S.D.'s birth defect and condition of incontinence is a form of medical assistance that is described in § 1396d(a) under the category of "home health care services." § 1396d(a)(7). For all of the foregoing reasons, we conclude that LDHH violated the Medicaid Act by denying S.D. a service described in § 1396d(a) that is necessary for ameliorative purposes under the EPSDT program. *See* §1396d(r)(5).

IV.

LDHH's appellate counsel appear to argue, without complete clarity or consistency, that the EPSDT mandate does not require LDHH to pay for the prescription of disposable incontinence underwear for S.D. in this case because (1) CMS approved an exclusion of those supplies from EPSDT coverage as part of the Louisiana state plan, or (2) LDHH has implied authority to establish exclusions from EPSDT coverage without CMS approval, and LDHH used that authority to exclude medical assistance for disposable incontinence underwear in this case. These arguments are without merit.

33

A.

Before addressing the arguments, in order to avoid confusion, we need to identify and dispel a number of false issues, inapposite authorities, and misapplication of statutory elements that LDHH's appellate counsel use sophistically in support of their litigating position: (1) LDHH counsel repeatedly confuse and blur the important distinction between (a) the Medicaid Act's mandatory statutory edict and criterion for the correction or amelioration of defects, illnesses and conditions of EPSDT children and (b) the State plans' bilaterally contracted (state proposed and CMS approved) definitions and standards for the medical assistance provided to the general Medicaid population.[15] (2) This case does not present an attack upon a state plan's federally approved limitation on the basic coverage provided to

---

[15] LDHH First Br. pp. 19, 20 (confusing Medicaid Act's direct definition of EPSDT benefit for EPSDT children with Act's requirement that participating states propose state plans with standards for determining the extent of medical assistance under the plan for the general Medicaid population); 22-24 (confusing the disputed question of whether states must provide care or services "medically necessary" for general recipients under its state plan with the undisputed, more focused EPSTD statutory requirement that states must provide medical assistance "necessary...to correct or ameliorate" defects, illnesses and conditions discovered by screening); 24-25 (misinterpreting CMS's approval of Louisiana State plan's exclusion of incontinence supplies for general Medicaid population as approving an exclusion of such medical assistance for EPSDT children); 27 (same as confusion noted on pp. 19, 24-25 of that brief).

the general Medicaid population, as in cases relied upon by LDHH.[16] (3) The validity of the Louisiana state plan's exclusion of incontinence supplies from "home health care services" for the general Medicaid population is not disputed in this case-it is LDHH's attempt to apply that exclusion to coverage under the EPSDT program that is controversial here.[17] (4) Furthermore, because this case does not call upon us to review CMS's approval of the Louisiana state plan, LDHH's citations and discussion pertaining to judicial review of such federal agency action are irrelevant and misleading.[18]

LDHH's reliance on other irrelevancies is similarly misguided. An email from a CMS employee, who did not profess to speak authoritatively for CMS, does not constitute a thoroughly

---

[16] LDHH First Br. P. 22-24, relying on *DeSario v. Thomas*, 139 F3d 80, 96 (2d Cir. 1998), *vacated by Slekis v. Thomas*, 525 U.S. 1098 (1999) (upholding state agency's decision to deny coverage of certain medical supplies for the general Medicaid population); *Charleston Mem'l Hosp. v. Conrad*, 693 F.2d 324, 329-30 (4th Cir. 1982)(upholding coverage limitations on number of inpatient hospital days for general Medicaid population); *Dougherty v. Dep't of Human Services*, 449 A.2d 1235, 1238 (N.J. 1982) (upholding coverage denial for medically necessary environmental equipment without mentioning EPSDT program.)

[17] LDHH First Br. P. 19

[18] LDHH First Br. pp. 25-26 (citing cases involving judicial review of federal agency action: *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir. 1991); *Illinois Health Care Ass'n. v. Bradley*, 983 F.2d 1460, 1463 (7th Cir. 1993); *Garfield Medical Ctr. v. Belshe*, 80 Cal. Rptr. 2d 527, 532 (Cal.Ct.App. 1998)).

considered statutory construction by CMS that is owed any judicial deference or that is relevant to this case.[19] The Medicare manual relied upon by LDHH is inapposite because the home health benefits provided under the two programs are not comparable and Medicare, unlike Medicaid, does not provide for the EPSDT program.[20] The Children's Choice waiver program that provides, among other things, diapers to some Medicaid eligible minors does not prove that incontinence supplies are excluded from coverage under the EPSDT program.[21] CMS approves waiver programs that provide items and services that are also provided by the EPSDT program if the *nature and amount* of services provided under the waiver exceed

---

[19] LDHH First Br. P. 17; *Skidmore* deference is entirely inappropriate for the opinion of a single employee who has no authority to speak on behalf of the agency. *See Skidmore v. Swift*, 323 U.S. 134, 139 (1944) (according deference to agency *Administrator's* policies because, inter alia, such "policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case.")

[20] LDHH First Br. p. 18. LDHH cites a Home Health Services Manual issued by CMS and available at http://cms.hhs.gov/manuals/11_hha/hh205-2.asp#_1_3>. The manual contains a definition of the medical supplies available under the Medicare home health benefit that restricts such supplies to those that are essential to visits by home health aides. In accordance with that definition, diapers are covered only when utilized by a home health aide in the normal course of a bathing visit. There is no similar definition or restriction in the Medicaid Act. Furthermore, under Medicaid, unlike Medicare, "home health care services" are not limited to services provided in the home by a home health aide. *See* footnote 11. Thus, the Medicare provision is completely irrelevant to the matter at hand.

[21] LDHH First Br. p. 24.

that which is otherwise covered under the state plan. *See* SMM §
4442.3A.3. LDHH's arguments based on these immaterial matters
merely obscure and deflect attention from the relevant issues
discussed in previous parts of this opinion.

B.

Contrary to LDHH counsel's insinuations, the Louisiana state
plan does not contain any provision that expressly or implicitly
excludes the prescription of disposable incontinence underwear
from the coverage provided under the EPSDT program. LDHH's
creative arguments to that effect are both confusing and
misleading. In short, LDHH contends that, under definitions
contained in its state plan and approved by CMS, incontinence
underwear is not a "medical supply" and, therefore, is not
available under the "home health care services" medical assistance
category.[22] Accordingly, although LDHH admits that it is required
to provide "home health care services" including "medical
supplies" to EPSDT recipients, LDHH argues that (1) the Louisiana
state plan defines the "medical supplies" available under the
"home health care services" medical assistance category as
excluding incontinence underwear, (2) CMS has approved Louisiana's
definition, and (3) because of CMS's "imprimatur" LDHH's
definition of "medical supplies" is entitled to deference. This

---

[22] LDHH First Br. 18, 19, 23, 24.

37

argument rests on a fallacy, however, because the state plan does not contain any definition, applicable to the EPSDT program, that would exclude incontinence underwear from the medical supplies available to persons under twenty-one when such supplies are necessary to correct or ameliorate conditions or defects discovered by screening.

The incontinence supplies exclusion relied upon by LDHH appears in Section 4.19-B of the state plan, a section entitled "Payment for Services." *See* LDHH First Br. p. 24-27. (citing R.135, which refers to Louisiana State Medicaid Plan § 4.19-B, item 7.) In item 7 of section 4.19-B the plan states that all medical supplies provided under the optional home health care services medical assistance category will be reimbursed through the "durable medical equipment" program. The plan further states that "diapers and blue pads" are not reimbursable through that program.[23] The section does not purport to define the term "medical supply" or the medical assistance category of "home health care services." Instead, the state plan merely excludes "diapers and blue pads" from a certain payment program. Although the parties agree that this section, in effect, excludes

---

[23] The provision counsel relies upon states: "For medically necessary Medical Supplies, Equipment and Appliances, reimbursement will be made through the Durable Medical Equipment Program which requires prior authorization for the item. . . .(a) Diapers and blue pads are not reimbursable as durable medical equipment items." Louisiana State Medicaid Plan § 4.19-B, item 7.

incontinence underwear from the medical supplies available to the general Medicaid population, it is irrelevant to S.D.'s claim because it does not apply to, refer to, or mention the EPSDT program. Payments provided under the EPSDT program are described in an altogether different section of the state plan which does not contain any exclusion of coverage for incontinence supplies. *Id.*, item 4.b.

After a careful examination of the Louisiana Medicaid State Plan,[24] including particularly Section 3.1, "Amount, Duration, and Scope of Services", and Section 4.19, "Payment for Services", we conclude that the plan does not define the term "medical supply" so as to exclude incontinence underwear nor otherwise implicitly or explicitly excludes that service from coverage under the EPSDT program. In addition, we note that LDHH conveniently fails to cite to the section of the state plan that defines the scope of services available under Louisiana's EPSDT program. In that section, the plan provides that the EPSDT benefit includes "all other health care described in section [1396d(a)] . . . that is found to be medically necessary to correct or ameliorate defects as well as physical and mental illnesses and conditions discovered by the screening service <u>even when such health care is not</u>

_____

[24] *See* http://www.cms.hhs.gov/medicaid/stateplans/toc.asp?state=LA; Official plan maintained by the CMS Regional Office; Copy also maintained by LDHH-BHSF-Policy Section, 1201 Capitol Access Rd, Fl 6, Baton Rouge, La. 70802.

otherwise covered by the State Plan . . . ." *Id.*, § 3.1-A, item 4.b (emphasis added.) Thus, the exclusion of "diapers and blue pads" that appears in the optional home health care section of the state plan is specifically not applicable to the EPSDT program. Therefore, there is no factual or legal basis for LDHH's argument that its denial of S.D.'s claim is supported by any definition or exclusion in the approved state plan.

In this connection, LDHH also argues that, because of CMS's "imprimatur" of such a definition or exclusion, its determination that the state plan bars coverage in this instance should have been reviewed by the district court under the deferential standards that courts apply to federal agency actions. The main flaw in this argument, among others, is, of course, that because there is no such definition or exclusion in the state plan, CMS approval of the state plan cannot amount to an imprimatur of such a provision.

C.

LDHH's appellate counsel further suggest that LDHH's denial of S.D.'s claim should be accorded deference and upheld because (1) the Medicaid Act grants LDHH the implied authority or discretion, without CMS review and approval, to make reasonable exclusions from EPSDT coverage, either by directly excluding certain types of health care or measures or indirectly by regulating the amount, duration and scope of the health care

40

provided by the EPSDT program; and that (2) LDHH acted pursuant to this authority when it denied S.D.'s claim for medical assistance. Assuming, for the sake or argument only, that the Medicaid Act delegates such implied authority to LDHH, the short answer to this attempted justification is that LDHH did not base its action on such implied authority. Rather, it is clear that LDHH denied S.D.'s claim on three limited grounds: (1) the disposable incontinence underwear prescribed by his physician was available through another agency, (2) was not medically necessary, and (3) was outside the scope of Medicaid.[25] LDHH offered no other reason for its denial of S.D.'s claim. Specifically, LDHH did not indicate that S.D.'s claim was within EPSDT coverage but excluded therefrom by LDHH's own rule or policy based on its implied authority or discretion. Nor is there any material in the record from which we may reasonably discern that this was the basis and reason for the agency's decision.

"It is elementary that if an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rationale set forth by the agency itself." *Fort*

---

[25] In this appeal, however, LDHH counsel conceded error as to reason(1). LDHH First Br. 2. Reason (2) is not at issue because LDHH does not contest the district court's determination that the prescription of the incontinence supplies are necessary to the amelioration of S.D.'s conditions for purposes of the ESPDT program.

*Stewart Schools v. FLRA*, 495 U.S. 641, 651-652 (1990); *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943). "Post-hoc explanations—especially those offered by appellate counsel—are simply an inadequate basis for the exercise of substantive review of an administrative decision." *United States v. Garner*, 767 F.2d 104, 117 (5th Cir. 1985)(citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1060 (5th Cir. 1985); *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299, n.8 (5th Cir. 1983); *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-213 (1988); *Pension Benefit Guaranty Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362 (5th Cir. 2004); *Ass'n of Civilian Technicians, v. FLRA*, 269 F.3d 1112, 1117 (D.C. Cir. 2001). Consequently, we must reject LDHH appellate counsel's attempts to support the denial of S.D.'s claim upon a ground not set forth by LDHH itself.

Therefore, we do not reach the hypothetical question which LDHH appellate counsel's post hoc rationalizations seek to raise, viz., whether LDHH has implied authority or discretion to establish exclusions from EPSDT coverage without CMS approval.[26]

---

[26] LDHH counsel continually base arguments on their assumption and assertion that the Medicaid Act grants states complete or autonomous discretion to adopt or change their state plans and the coverage provided thereunder without the need for CMS approval. LDHH First Br. 4, 20, 21. According to LDHH, the Medicaid Act confers "broad discretion" upon the states. The statements by courts to that effect, however, appear to stem from language in cases such as *Beal v. Doe*, 432 U.S. 438, 444 (1977).

We note, however, that, in any event, the cases cited by LDHH counsel are inapposite to this question.[27]

V.

Having concluded that the Medicaid Act's ESPDT mandate requires LDHH to provide S.D. with medical assistance for the prescribed disposable incontinence underwear because it is necessary to ameliorate S.D.'s conditions caused by his total bowel and bladder incontinence and spina bifida, we now confront

---

In that case, the Supreme Court quoted 42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V), which provided: "A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan . . . ." (emphasis added.) The Court determined that "[t]his language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Id.*(footnote omitted). When read in context, however, it is evident that the Court was referring to the Medicaid Act's conferral of "broad discretion" upon the states to submit proposed state plan provisions for review and approval by the Secretary, not to any authority of the states to autonomously exclude items or services from the coverage provided under the state plan.

[27] *See* LDHH First Brief pp. 20, 22-24 (citing *Alexander v. Choate*, 469 U.S. 287, 303 (1985); *Smith v. Rasmussen*, 249 F.3d 755, 759(8th Cir. 2001); *DeSario v. Thomas*, 139 F.3d 80, 88 (2d Cir. 1998) *vacated by Slekis v. Thomas*, 525 U.S. 1098 (1999); *Louisiana v. United States Dep't of Health and Human Servs/*, 905 F.2d 877, 878 (5th Cir. 1990); *Charleston Mem'l Hosp. v. Conrad*, 693 F.2d 324 (4th Cir. 1982); *King v. Sullivan*, 776 F. Supp. 645 (D.R.I. 1991); *Dougherty v. Dep't of Human Servs.*, 449 A.2d 1235, 1238 (N.J. 1982)). Most of these cases deal with the general Medicaid coverage (including adults) provided for under a state plan; none deal with a state's attempt adopt an EPSDT coverage exclusion without CMS approval. Further, none stand for the proposition that a state plan may be amended to adopt coverage exclusions without the approval of CMS.

LDHH's assertion that S.D. cannot enforce that requirement under 42 U.S.C. § 1983.

Section 1983 provides a cause of action against state officials for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" but does not provide a mechanism through which citizens can enforce federal law generally. Instead, it provides redress only for a plaintiff who asserts a "violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990).

In *Blessing v. Freestone,* 520 U.S. at 340, the Supreme Court reiterated the three factors that it has traditionally considered when determining whether a particular federal statute gives rise to a right enforceable by § 1983: (1) whether Congress intended for the provision to benefit the plaintiff; (2) whether the plaintiff can show that the right in question is not so "vague and amorphous" that its enforcement would "strain judicial competence"; and (3) whether the statute unambiguously imposes a binding obligation on the states. *See Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 925 (5th Cir. 2000).

In *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002), the Supreme Court noted that some courts had misinterpreted the first *Blessing* factor as permitting a § 1983 action whenever the

44

plaintiff fell within the general zone of interests protected by the statute at issue. The Court clarified that nothing short of an unambiguously conferred *right* can support a cause of action under § 1983. The appropriate inquiry, therefore, is "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.*, 285. Critical to this inquiry is whether the pertinent statute contains "rights-creating" language such as that found in Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.[28] *Id.*, 284, 287. Accordingly, we begin our analysis by returning to the text of the Medicaid Act.

The Medicaid Act provides that "[a] State Plan must provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a) of this title, to all individuals" who meet certain eligibility criteria. 42 U.S.C. § 1396a(a)(10)(A)(i). EPSDT care and services are listed in paragraph 4 of § 1396d(a) and, by reference to § 1396d(r), include all the health care, treatment, services, and other measures described in § 1396d(a)

---

[28] Title VI provides: "<u>No person</u> in the United States <u>shall</u> ... be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 42 U.S.C. § 2000d (emphasis added). Title IX provides: "<u>No person</u> in the United States <u>shall</u>, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added).

when necessary for corrective or ameliorative purposes. This is precisely the sort of "rights-creating" language identified in *Gonzaga* as critical to demonstrating a congressional intent to establish a new right. Accordingly, as the Third Circuit concluded, "it [is] difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant [Medicaid Act] language-'A State Plan must provide'- from the 'No person shall' language of Titles VI and IX" which was held up in *Gonzaga* as the prototypical rights-creating language. *Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004)(concluding that § 1396a(a)(10)(A) creates a federal right to medical assistance for intermediate care facility services); *accord Rabin v. Wilson-Coker,* 362 F.3d 190, 201-2 (2d Cir. 2004); *Bryson v. Shumway,* 308 F.3d 79, 89 (1st Cir. 2002).

The only potentially material difference between the rights-creating language contained in § 1396a(a)(10)(A) and that contained in Titles VI and IX is that the Medicaid Act requires state action under a medical assistance plan. The requirement of action under a plan is not, however, dispositive of the question of whether the statute confers rights enforceable by § 1983. "In an action brought to enforce a provision of [the Social Security chapter of the United States Code], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents

46

of a State plan" 42 U.S.C. § 1320a-2; *see also Harris v. James,* 127 F.3d 993, 1003 (11th Cir. 1997)("[I]n light of [§ 1320a-2], it is clear that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983.") Thus, for all of the forgoing reasons we conclude that the EPSDT treatment provisions of the Medicaid Act contains the "rights-creating language critical to showing the requisite congressional intent to confer a new right." *Gonzaga*, supra, 536 U.S. at 274.

Moreover, the Medicaid Act confers the right to the health care, treatment, services and other measures described in §1396d(a) when necessary for EPSDT ameliorative purposes upon an identified class. The statute requires that participating states provide such care and services "to all individuals" who meet the plan eligibility requirements and are under the age of twenty-one. *See* 42 U.S.C. §§ 1396a(10)(A), 1396d(a)(4)(B). Thus, rather than having merely an aggregate focus, the EPSDT provisions are "concerned with whether the needs of [particular individuals] have been satisfied." *Gonzaga*, supra, 536 U.S. at 275. Furthermore, the statutory provision at issue in the present case is not directed to the systemwide administration of the EPSDT program but, rather, requires that health care and services must be

47

provided to all eligible recipients under the age of twenty-one.[29]

Thus, because it is undisputed that the plaintiff is an eligible recipient of EPSDT services, we conclude that the relevant provisions of the Medicaid Act satisfy the first *Blessing* factor, as clarified by *Gonzaga*, in that the Act evidences a congressional intent to confer a right to the health care, services, treatments and other measures described in § 1396d(a), when necessary for EPSDT ameliorative purposes, upon the plaintiff.

Our conclusion is amply supported by the decisions of this court and other federal Circuits. Before the Supreme Court's decision in *Gonzaga,* numerous courts, including this court, had concluded that the Medicaid Act confers, upon eligible children, a federal right to the health care, treatment and measures mandated by the EPSDT program. *See e.g. Mitchell v. Johnston*, 701 F.2d 337, 344 (5th Cir. 1983) (holding that EPSDT children had a right, enforceable by § 1983, to preventive dental care); *Pediatric Specialty Care, Inc. v. Ark. Dep't. of Human Servs.*, 293

---

[29] Accordingly, this case is distinguishable from *Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) rev'd by *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004). In *Frazar*, the plaintiffs claims did not concern any individual recipient's access to services required by federal law. Rather, the claims concerned the systemwide standards and measures employed by the state Medicaid agency in its administration of the EPSDT program. This court concluded that such generalized standards and procedures do not create individualized rights actionable under § 1983. In contrast, this case is solely concerned with the right of an individual to a particular service to which he is entitled under federal law.

F.3d 472, 479 (8th Cir. 2002) (holding "that the plaintiffs have a federal right to EPSDT services that is enforceable in a § 1983 action"); *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319-1320 (7th Cir. 1993) (EPSDT treatment provisions are enforceable by § 1983). Moreover, the district courts that have considered the enforceability of the EPSDT provisions after *Gonzaga* have concluded that the statute creates rights to treatment that are enforceable under § 1983. *See Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332 (N.D. Ill.); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 293-94 (N.D.Ga., 2003); *Collins v. Hamilton*, 231 F. Supp. 2d 840, 846-47 (S.D.Ind. 2002).[30]

Finally, several post-*Gonzaga* circuit court decisions have held that provisions of the Medicaid Act containing language similar to § 1396a(a)(10)(A), i.e. "[a] State Plan must provide for making medical assistance available, including [EPSDT benefits] to all individuals", are enforceable by § 1983. Specifically, the Second Circuit in *Rabin v. Wilson-Coker,* 362 F.3d 190, 201-2 (2d Cir. 2004) concluded that Congress intended to create an enforceable right to a temporary grace period by stating that "each State plan . . . must provide" the specified grace period for families meeting certain requirements. *See* 42 U.S.C. § 1396r-6.

---

[30] The Seventh Circuit affirmed the *Collins* decision at 349 F.3d 371 (7th Cir. 2003) without specifically addressing the § 1983 issue.

The Sixth Circuit has held that the fair hearing provision of the Medicaid Act, 42 U.S.C. 1369a(3), which states that "[a] State plan for medical assistance must provide for granting an opportunity for a fair hearing . . . to any individual whose claim . . . is denied . . . ." unambiguously confers an enforceable federal right. *Gean v. Hattaway* 330 F.3d 758, 772-73 (6th Cir. 2003). The First and Third Circuits concluded that 42 U.S.C. 1396a(8) unambiguously confers a federal right by requiring that medical assistance under a state plan "shall be furnished with reasonable promptness to all eligible individuals." *Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004); *Bryson v. Shumway,* 308 F.3d 79, 89 (1st Cir. 2002).[31]

Turning to the second *Blessing* factor, we conclude that the right asserted by S.D. is not so "vague and amorphous" that its

---

[31] The First and Seventh Circuits have concluded that certain provisions of the Medicaid Act are not enforceable by § 1983 after *Gonzaga*.  Those cases are readily distinguishable, however, in that they concern Medicaid provisions that are insufficiently definite or that only indirectly benefit a particular plaintiff. *See Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 57-58 (1st. Cir. 2004)(section 1396a(a)(30)(A) which provides that state plans must, inter alia, safeguard against unnecessary utilization and "assure that payments are consistent with efficiency, economy and quality of care" so as to enlist sufficient providers confers only an indirect benefit on providers and is, therefore, not enforceable by providers); *Bruggeman v. Blagojevich,* 324 F.3d 906, 911 (7th Cir. 2003)(section 1396a(a)(19), which requires that state Medicaid plans "provide such safeguards as may be necessary to assure that eligibility . . . will be determined, and . . . services provided, in a manner consistent with . . . the best interests of the recipients" does not create any specific duty on the part of the states and does not confer an individual right enforceable by § 1983.)

50

enforcement would "strain judicial competence." *Blessing v. Freestone*, supra, 520 U.S. at 340. S.D. asks the courts to interpret the EPSDT statutes to ascertain whether they require Louisiana to provide him with a specific benefit, namely, incontinence supplies medically necessary for EPSDT ameliorative purposes. That level of statutory analysis does not "strain judicial competence;" it is the sort of work in which courts engage every day. The EPSDT provisions at issue are no more "vague and amorphous" than other statutory terms that this court, as well as other courts, have found capable of judicial enforcement. In *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 519-520 (1990), the Supreme Court held enforceable under § 1983 the Medicaid Act's requirement that states adopt Medicaid reimbursement rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."[32] In *Evergreen Presbyterian Ministries*, 235 F.3d 908, 925 (5th Cir. 2000), this court followed the lead of "many other courts" and held that the "equal access" mandate of § 1396(a)(30)(A) is not too vague to be enforceable. Other Circuits have found that the right to health care, services, treatment and other measures described in § 1396d(a) when necessary for EPSDT ameliorative purposes is not too vague to be enforceable under § 1983. *See Pediatric Speciality Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 479 (8th

---

[32] 42 U.S.C. § 1396a(a)(13)(A)).

51

Cir. 2002); *Westside Mothers v. Haveman*, 289 F.3d 852, 863 (6th Cir. 2002); *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319-20 (7th Cir. 1993).

Finally, S.D. easily satisfies the third *Blessing* factor because the Medicaid statute unambiguously imposes EPSDT obligations on the participating states. *See* 42 U.S.C. § 1396a(a)(10)(A) (stating that "[a] State plan for medical assistance <u>must</u> provide for making medical assistance available, including [EPSDT benefits]" (emphasis added)); *see also Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319 (7th Cir. 1993) (holding that third *Blessing* factor is satisfied by EPSDT provisions because "[s]tates participating in the Medicaid program <u>must</u> provide EPSDT services to all individuals under age twenty-one") (emphasis added). Thus the statutory provisions at issue in the present case satisfy the *Blessing* test and are enforceable by § 1983.[33]

LDHH does not dispute that S.D.'s right to receive services under the EPSDT program is enforceable in an action brought under § 1983. Rather, LDHH claims that the right specifically claimed by S.D., namely, the right to medically necessary incontinence supplies, is not enforceable because Congress did not specifically

---

[33] Satisfaction of the *Blessing* factors establishes that a right is presumptively enforceable by § 1983. *See Blessing,* supra, 520 U.S. at 341. Although the State may rebut this presumption by showing that Congress "specifically foreclosed a remedy under 1983" it has not done so in this case. *Id.*

list this service in the statute.  LDHH claims that even if, as we have concluded, medically necessary incontinence supplies must be provided to EPSDT eligible children as a "home health care service", this requirement is based upon CMS's construction of the statute rather than on the statutory text itself.  According to LDHH, because the specific right at issue is provided by the agency's interpretations rather than by Congress, under the Supreme Court's decision in *Alexander v. Sandoval,* 532 U.S. 275*,* 291 (2001), the right is not enforceable by § 1983.  LDHH, however, misinterprets *Sandoval.*

In *Sandoval*, the Supreme Court held that no private right of action exists to enforce a regulation banning disparate impact discrimination that was enacted under Title VI of the Civil Rights Act of 1964 ("Title VI").  Title VI § 601, a rights-creating provision, states that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered. 42 U.S.C. § 2000d.  The Supreme Court noted that it was "beyond dispute" that individuals could sue to enforce § 601's prohibition on discrimination. *Sandoval*, supra, 532 U.S. at 280.  Furthermore, the Supreme Court found that it was similarly beyond dispute that § 601 prohibits only intentional discrimination. *Id.*  The plaintiffs in *Sandoval,* however, did not allege intentional discrimination but,

53

rather, alleged only disparate impact discrimination.

Section 602 of Title VI states that "each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability...." 42 U.S.C. § 2000d-1. The Department of Justice, pursuant to § 602, had issued regulations that prohibited disparate impact discrimination.[34]

The Supreme Court examined the text of § 602, searching for evidence of congressional intent to create the private right of action asserted by the plaintiffs. It recognized the absence of any rights-creating language, such as found in § 601, and concluded that there was "no evidence anywhere in the text to suggest that Congress intended to create a private right to enforce regulations promulgated under § 602." *Id.*, 1522.

Both the government and the plaintiffs argued that the regulations barring disparate impact discrimination, enacted under § 602, were privately enforceable because the *regulations themselves* contained rights-creating language. The Supreme Court rejected this argument stating "[l]anguage in a regulation may invoke a private right of action that Congress through statutory

---

[34]For the purpose of its decision, the Supreme Court assumed, without deciding, that the regulation was valid.

54

text has created, but it may not create a right that Congress has not." *Id.*, 291. Therefore, "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Id.*

Important for our purposes, however, the Supreme Court also stated that it did "not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that action. Such regulations, if valid and reasonable, authoritatively construe the statute itself." *Id.,* 284. Moreover, "[a] Congress that intends the statute to be enforced through [§ 1983] intends the authoritative interpretation of the statute to be so enforced as well." *Id.*

In the present case, the rights-creating language relied upon by the plaintiff is contained in the statute itself. Furthermore, the regulations implementing the statute, and defining "home health care services" to include "medical supplies", are authoritative interpretations of the statute and are enforceable by § 1983. Finally, as discussed in section III, medically necessary incontinence supplies fall within the natural and plain meaning of the term "medical supplies" and CMS has interpreted the "home health care services" category as specifically including such supplies. Accordingly, the federal statutory right asserted by the plaintiff is enforceable under § 1983.

55

For these reasons, the judgment of the district court is AFFIRMED.