The STATE OF LOUISIANA,
Petitioner,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
Respondent.

No. 89–4566.

United States Court of Appeals,
Fifth Circuit.

July 13, 1990.

Rehearing Denied Aug. 14, 1990.

Jerry L. Phillips, Charles Castille and Robert W. Sawyer, Jr., Gen. Counsel, State of La., Dept. of Health & Hospitals, Baton Rouge, La., for petitioner.

Stephen M. Sullivan and Jack Mark Stolier, New Orleans, La., intervenors.

Donald F. Dickey, Office of Gen. Counsel, Dept. of Health and Human Services, Baltimore, Md., Kermit Fonteno, Dept. of Health and Human Services, Health Care Financing Admin., Dallas, Tex., for respondent.

Before KING, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Louisiana appeals the decision of the Administrator of the Health Care Financing Administration disapproving a proposed amendment to the state's Medicaid plan. The state proposed to estimate participating pharmacists' acquisition costs for certain drugs to be the average wholesale price, as reported by the American Druggists' Bluebook or other national compendia. The Administrator concluded that this method did not sufficiently approximate the pharmacists' actual costs, and thus was inconsistent with the Medicaid statute and applicable regulations. We hold that the Administrator's interpretation of the statute and regulations was permissible, and therefore affirm.

I.

A.

The Medicaid program, Title XIX of the Social Security Act, is a cooperative federal-state program to furnish medical assistance to eligible low-income individuals. 42 U.S.C. § 1396 et seq.; *see Atkins v. Rivera*, 477 U.S. 154, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986); *Schweiker v. Hogan*, 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The federal government and the states jointly finance the program, and the states administer it. The program is voluntary, but participants must submit a "state plan" meeting the Medicaid statute and rules of the Secretary of Health and Human Services. 42 U.S.C. § 1396a; *see Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981); *Harris v. McRae*, 448 U.S. at 301, 100 S.Ct. at 2680; *see also*, 42 C.F.R. § 430.0 et seq. (1988). The Secretary has delegated his authority to carry out federal duties under the statute to the Administrator of the Health Care Financing Administration, an agency within the Department of Health and Human Services.

If the Administrator approves the state plan, the state is entitled to reimbursement from the federal government for a portion of its payments to providers furnishing services to Medicaid recipients. This reimbursement is known as "federal financial participation" or FFP. 42 U.S.C. § 1396b(a); 42 C.F.R. § 430.30.

The Medicaid statute and the regulations promulgated thereunder charge the Secretary to ensure that state plans, including amendments, originally meet and continue to meet the federal requirements. 42 U.S.C. §§ 1316(a)(1), 1396a, 1396c; 42 C.F.R. § 430.15. As long as the plans meet federal requirements, the states have considerable discretion to design and operate their individual programs. *Lewis v. Hegstrom*, 767 F.2d 1371 (9th Cir.1985); *District of Columbia Podiatry Society v. District of Columbia*, 407 F.Supp. 1259 (D.D.C.1975). If the Administrator determines that a plan or amendment does not meet the federal requirements, he issues a disapproval determination under 42 C.F.R. § 430.15(c). The state may seek adminis-

trative and judicial review of these determinations, as Louisiana has done here. *See* 42 U.S.C. § 1316(a)(2), (c); 42 C.F.R. §§ 430.18, 430.60 et seq.

One federal requirement is that the state plan "provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan ... as may be necessary ... to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). The portion of Louisiana's plan at issue here, prescription drug coverage, is of course subject to this requirement, and Louisiana's payments to pharmacists had to meet this standard. *See Arkansas Pharmacists Association v. Harris*, 627 F.2d 867 (8th Cir.1980). The Secretary has, on three occasions, promulgated regulations governing the maximum amounts of state expenditures for prescription drugs that the Administrator of the Health Care Financing Administration will recognize in paying FFP.

In 1969, the Secretary provided that the upper limit on state prescription drug expenditures would be the lower of (1) the cost of the drug to the pharmacist as defined by the state, plus a dispensing fee, or (2) the pharmacists' reasonable customary charges. 45 C.F.R. § 250.30(b)(2) (1970). In 1975, the Secretary revised this regulation to establish specific requirements governing the states' determination of the cost of the drug to the pharmacist, under the cost plus dispensing fee formula. These new requirements distinguished between certain commonly dispensed multiple-source drugs and all other drugs. Multiple-source drugs are those available under different brand names or both under brand name and in generic form.

The Secretary defined the cost of multiple-source drugs as the lower of the maximum allowable cost (MAC) and the estimated acquisition cost (EAC). The MAC is the lowest price at which a drug product is widely and consistently available for pharmacists, as determined by a Pharmaceutical Reimbursement Board under procedures set forth in 45 C.F.R. § 19.5 (1986). The EAC is the state's closest estimate of the price generally and currently paid by pharmacists for the drug product. For the "all other drugs" category, the Secretary defined the cost simply as the EAC. The issue in this case is the application of the EAC cost limit in the all other drugs category.

In 1987, the Secretary revised these regulations one more time. For the all other drugs category, the formula remained the same—EAC plus dispensing fee or customary reasonable charges—but applied on an aggregate rather than a drug-specific basis. 42 C.F.R. § 447.332 (1988). This means that a state's EAC formula may overestimate the cost of some specific drugs, as long as the formula produces the closest, best estimate of the price pharmacists generally and currently pay for this category as a whole. The 1987 regulations also required the state to (1) describe comprehensively its cost calculation method, (2) make a finding for each of the two drug categories that its reimbursements will not exceed the aggregate upper limit the regulations set for the category, (3) assure the HCFA that it has made these findings, and (4) maintain and make available to HCFA, upon request, documentary evidence to support the findings. 42 C.F.R. § 447.333 (1988). This documentary evidence must include data, mathematical and statistical computations, comparisons, and any other pertinent records. 42 C.F.R. § 447.333(c). The state's assurance confers presumptive validity on its findings, but the Administrator may of course determine otherwise. *Id.*

### B.

Louisiana submitted amendment No. 87–33 to the Health Care Financing Administration to comply with the 1987 revision. The amendment defined EAC as the average wholesale price (AWP) of the drug dispensed, as reported by the American Druggists' Blue Book or other national compendia of drug prices. There has been considerable doubt for a number of years whether AWP provides the closest estimate of the price generally and currently paid by pharmacists for drugs.

The dissatisfaction was apparent while the 1969 regulations were still in place and states' definitions of cost were not controlled by explicit federal regulations. The Social and Rehabilitation Service, which at the time administered the Medicaid program on behalf of the Secretary, adopted the 1975 modifications, including establishing EAC, because it determined that most states defined cost as AWP or other standard prices that were "frequently in excess of actual acquisition costs to the retail pharmacist." 39 Fed.Reg. 41,480 (November 27, 1974). The SRS originally wished to force states to determine actual acquisition costs, but settled for EAC because determining actual costs would be too expensive. Several commenters suggested that AWP would be a good measure, but the Secretary and SRS rejected this because "AWP data are frequently inflated." 40 Fed.Reg. 34,518 (August 15, 1975).

In December 1977, the Department sent an "action transmittal" to the states, telling them that although they did not have to determine actual acquisition cost, the EAC required them to give their closest estimate, and that the Department was not convinced that those states still using AWP had made a "real effort" to do that. The Department suggested that these states might make their EACs more accurate by reducing the AWP by a percentage or by using the direct prices of certain manufacturers. The direct price is the price at which a manufacturer will sell directly to the retail pharmacist, bypassing the wholesaler.

In June 1984, the Office of Inspector General published a lengthy report of an audit of pharmacy drug purchases in six states. The report found that 99.6% of these purchases were made at prices averaging approximately 15.93% below AWP. The prices were below AWP because of purchase and trade discounts routinely available to purchasing pharmacies, regardless of their locations (small or large towns) or their type of ownership (chain or independent). Noting that 27 states still used AWP as their primary measure of EAC, and that 20 more used it to a great extent, the report concluded that states'

EACs "resulted in drug reimbursement limits that are significantly higher than the prices pharmacies generally pay for their drugs." The report recommended, among other things, that the HCFA prohibit the use of AWP in determining EAC.

The HCFA was not prepared to go that far, although it generally agreed with the report. The HCFA believed it was premature to prohibit the use of AWP, as alternative pricing mechanisms had not yet been developed, and because the Secretary had not yet made a decision on the report of a Task Force appointed to review prescription drug regulations for federally funded programs. But it did agree to explore alternative mechanisms and to advise states of the problems with AWP, mentioning as one possibility the reduction of AWP by a certain percentage to reflect the discounts.

In 1985, HCFA attempted briefly to enforce a uniform requirement that AWP be reduced by 10.5%, although this requirement was not in the regulations. The National Association of Chain Drug Stores, the National Association of Retail Druggists, and others sought declaratory and injunctive relief in federal district court against the enforcement of this requirement. HCFA rescinded the requirement in response to their motion for a preliminary injunction. The HCFA wrote to its regional offices stating that its policy was that the states were free to choose any pricing method that would result in the most accurate reflection of actual cost, and that there was no specific federal requirement. The HCFA added, however, that states could not be permitted to rely solely on AWP without evidence showing that this was their closest estimate.

C.

Louisiana filed its proposed amendment in October 1987. On December 11, the Region VI office wrote the state requesting its Medicaid agency to "explain how you concluded that AWP is your best estimate of the price generally and currently paid by providers for drug products." On February 12, 1988, the state responded that

"[r]eviews conducted by the State Agency indicate that [AWP as determined by] Blue Book tape data is a reliable indicator of the prices charged by wholesalers throughout the State." The state said that its formula for establishing the dispensing fee (usually 60% of cost) accounted for any discounts.

On May 16, 1988, the HCFA Administrator rejected the amendment, finding AWP too high an estimate. He reached the same conclusion on reconsideration. *In re: The Disapproval of Louisiana State Plan Amendment No. 87–33*, No. 88–11 (HCFA Administrator June 9, 1989). Louisiana then sought review in this court pursuant to 42 U.S.C. § 1316(a)(3).

## II.

We review the disapproval under the Administrative Procedure Act and must affirm unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Mercy Hospital of Laredo v. Heckler*, 777 F.2d 1028 (5th Cir.1985). Under this standard, we accord great deference to an agency's interpretation of its own regulations, reversing only when the interpretation plainly is erroneous or inconsistent with the regulations. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Mercy Hospital*, 777 F.2d at 1031–1032. If the agency's ruling meets these standards, our belief that an alternate interpretation is more appropriate is irrelevant. *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201 (5th Cir.1980), *cert. denied*, 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981).

■ Louisiana and the intervenors argue that the evidence in the record establishes that the proposed amendment comports with the federal requirements, and that the Administrator's ruling is a veiled attempt to change those requirements to prohibit the use of AWP. We disagree. Perhaps the Secretary and the HCFA believe that the use of AWP should be prohibited entirely, but they did not attempt to do so with this ruling. Rather, the HCFA determined only that Louisiana's use of AWP did not render the closest estimate of the price the pharmacists were generally and currently paying. There was sufficient evidence to support that finding.

## A.

Louisiana contends that it proved its program met the federal requirements because it offered evidence that its reimbursements in the "all other drugs" category did not exceed the aggregate upper limit for that category, and because, although AWP exceeds pharmacists' actual costs, the evidence showed that other aspects of the plan kept the state's actual reimbursements to AWP minus 9.36%. A disapproval in the face of this evidence, argues the state, must be arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

We accept Louisiana's contention that it satisfied the requirements of 42 C.F.R. § 447.333. That is, it found that its cost calculation method would not result in reimbursement methods that exceeded the aggregate upper limit for the all other drugs category, and it offered documentary evidence to prove it. The Administrator did not, and the Department does not now, contend otherwise. But the Administrator concluded that satisfying these requirements did not relieve the state of its obligation to determine the closest estimate possible of the actual acquisition cost. This was a permissible interpretation of the regulations.

The EAC requirement has been in the regulations for fifteen years in the same form. There is no suggestion that the 1987 revisions were intended to alter the requirement, other than to allow states to calculate it in the aggregate rather than on a drug-specific basis. Indeed, the rulemaking proceeding that resulted in the adoption of the 1987 revisions compels the opposite conclusion. The proposed rule set forth three options for revising the drug reimbursement regulations. Two of the options would have replaced or revised the MAC program for certain multiple-source drugs,

but left the all other drugs category alone. 51 Fed.Reg. 29,560 (August 19, 1986). The third option would have eliminated both MAC and EAC, for both categories, adopting instead a single upper limit on the individual pharmacist's retail charge, with a special 5–10% discount on single-source drugs. *Id.* The HCFA rejected all three options in favor of the current rule. 52 Fed.Reg. 28,657.

■ Of course, allowing states to calculate cost in the aggregate rather than on a drug-specific basis does change the EAC requirement somewhat. The EAC for a particular drug need not be the closest estimate, so long as the EAC for the entire category is the closest estimate. But we do not think, given the history of the rulemaking proceeding, that a state complies with federal requirements merely by proving its reimbursements in a particular category do not exceed the aggregate upper limit.

Having said this, we need only determine whether the Administrator's finding that Louisiana's AWP was not the closest estimate withstands our limited appellate scrutiny. We think it does. The 1984 report of the Office of Inspector General offered statistical evidence that AWP was an inaccurate measure. The SRS had reached the same conclusion a decade earlier, when it proposed the 1975 regulations. After the OIG report was issued, the staff in HCFA's Region VI offices in Dallas conducted reviews of pharmacy purchasing prices in Louisiana, New Mexico, Oklahoma, and Texas. The staff concluded that AWP did not provide the closest estimate of pharmacists' prices in any of those states. Louisiana offered no evidence to the Administrator at the hearing to contradict this evidence.

### B.

■ The other arguments put forth by Louisiana and the intervenors also fail. They argue that HCFA has in effect amended the regulations to forbid the use of AWP, and that therefore it was required to give notice and an opportunity for comment. The Administrator's decision, however, only applied the regulations as written to Louisiana's proposed amendment. There is evidence that the Secretary and the HCFA would prefer to forbid the use of AWP entirely, and may do so as soon as alternative pricing methods are available. Such a change would require notice and comment. But there is nothing in the Administrator's decision here that indicates that Louisiana would not have prevailed had it been able to prove that AWP did provide the closest price estimate.

■ Finally, they argue that the decision contravenes Executive Order 12612 on Federalism, dated October 26, 1987. That order required federal agencies administering federal programs to give states the respect the Constitution requires. The order said that "[e]xecutive departments and agencies should closely examine the constitutional and statutory authority supporting any Federal action that would limit the policymaking discretion of the States and should carefully assess the necessity for any such action," and adds that "[w]ith respect to national policies administered by the States, the national government should grant the States the maximum administrative discretion. Intrusive Federal oversight of State administration is neither necessary or desirable." Order § 3(a),(c). First, we see nothing in the order that alters our reading of the regulations at issue here. Second, we see nothing in the Administrator's application of the regulation in this case that offends this order. Third, even if we did, we do not think the order's broad language provides any justiciable principles upon which we could base a decision, important as it is in urging a regulatory attitude.

AFFIRMED.